Of the morning is case number 23-2541, Autobar v. Berg. Mr. Canning, thank you, Your Honor. Good morning, Your Honors. If it pleases the Court, Michael Canning with the law firm Giordano Howell & Ren & Cecila, appearing for Autobar Systems of New Jersey, doing business as Total Liquor Controls. Respectfully, Your Honor, I'd like to reserve three minutes for rebuttal. Great. Thank you. If it pleases the Court, the law is well settled in this circuit that the destruction of one's business constitutes irreparable harm for which a preliminary injunction should issue. In Judge Goodrich's decision in Bateman over 60 years ago, and followed by the Second Circuit in Semis, both of those courts recognized that while you can calculate a monetary loss from the lost profits, where you have a longstanding relationship that has been terminated, there's more to it than just a monetary component.  So the first thing I want to understand is how do you read the district court's opinion here? Was it a finding of fact that we review for clear error? I see you nodding. Two aspects to it, Your Honor. Yes, one, the court committed clear error in two key factual findings, one in making the finding that Total Liquors did not establish that it would lose its business as a result of the termination. And secondly, its conclusion that Total Liquors can still market to other customers, and in the absence of the dealership agreement, Total Liquors may pursue any and all potential customers.  So let's ask about these fact findings. As I understand it, the evidence for this is the declarations of the principles. That's correct, Your Honor. Just declarations. But Instant Air Freight talked about, well, you know, what about having accounting statements, profit and loss statements, other stuff. If the district court just said, look, all they've got here are their own declarations. We don't have financials. How can we say that's clear error? Because it appears to us, Your Honor, that the district court didn't review or consider the Dorsey Declaration. You think they didn't consider it or the district or the dealership just discounted it? There's no reference to it in the decision. There's no reference to the content. And Mr. Dorsey in the declaration made it as clear as can be in paragraph 25, that if we are terminated, our business will end. All right. He says that, but why does the judge have to believe that? Let's go to his opinion where he says he grants the claim, if Berg terminates Total Liquor, forced to terminate four employees, but Total Liquor has not demonstrated the force to shut down its business. You know, he doesn't buy that the financials add up to that. There's not enough proof of this. So why should we read it your way as he just overlooked the plain, obvious thing that's in the record? Because the declaration makes clear that he doesn't have to credit the declaration. There's no evidence that was before the court to refute the facts that were asserted. You have the burden of proof. Correct. It's not their obligation to refute it. It's yours to persuade the district judge, right? That's correct. And what we did was we submitted proof in the form of the declaration that 85 percent of our business will go as a result of this. The court referenced that, but the court failed to factor in the other facts that were set forth in the declaration. The court says that Total Liquors, if terminated, can go out and sell to other customers. Well, that simply is not so, and that was shown in the declaration in which Mr. Dorsey … If the court credits the declaration, but you've got the burden of showing, you can't say. So, in fact, he says Total Liquor has not demonstrated, hasn't sufficiently persuaded them. You haven't satisfied the burden of proof. It's not that they have to conclusively disprove it. The way that we can demonstrate that is through the submission of a sworn certification from the principal of the company who says … You could have gotten financials. You didn't. You could have gotten accounting statements, profit laws, other stuff, the kinds of things that Instant Air Freight referred to, and you didn't. What we have is the testimony from the principal that 85 percent of the business is going to leave. Our four employees will no longer be able to retain. Without any employees, we can't do business. And significantly, Judge, we did submit in the declaration that we can't simply go out and get other business. We have … According to the record, as I recall it, one of the reasons why the franchise was terminated was that you were selling to forbidden competitors with Berg. And with that history of reaching out to other people, is that not a factor that the court could take into consideration when Autobar says, well, we just can't continue in business because it has been shown by their conduct that they were always looking for other customers anyway. No, Your Honor. The termination was clearly protectual. It was protectual for several reasons. One is that the stated ground was that you failed to meet your quota. Well, none of the businesses throughout the entire dealership, including the principal Barton, had ever each year met their quotas. Barton didn't meet it in six out of eight years. Secondly, in 2022, the year in which the asset purchase agreement was entered into in which these restrictive covenants were imposed, Total Liquor did satisfy its quota. And very significantly, Your Honors, is in May of 2022, when the asset purchase agreement was entered into, the restrictive covenants were imposed, but a carve-out was that Total Liquor was going to be able to continue to operate as a dealer. They knew at that time that this purported basis for determination, the failure to meet the quotas in years prior to 2022, had already taken place. But they say in the asset purchase agreement, you can continue to serve as a dealer. And what they do nine months later is they not only terminate the agreement, but we say we're going to now hold you to these restrictive covenants. The effect of that is they lose the business, and Mr. Dorsey, who has been in this business, the only thing he's ever done for 45 years, can no longer do that. And he certified in his declaration that I don't have the ability to go out and become another dealer. There's no other dealers in my territory. It's not like I can get hamburgers or I can get subs. I have to get a new dealership in order to get these liquor dispensing systems. I can't do that. If the agreement is terminated, why is Auto Bar constricted to selling only to approved dealers? Why are the dealers who were forbidden under the agreement, don't they open up to potential customers if the agreement is no longer in operation? The problem is there's no ability to get the product to sell to these potential customers. And this case is distinguishable from Your Honor's case in Benninger, because in that case the plaintiff could not establish it was unable to fulfill any contracts. The plaintiff there could not establish it was unable to get other sources of material to sell to its vendors. Dorsey in his declaration has made it crystal clear, I am not able to fulfill my contracts. If the district court credits the declaration. Okay. So let's talk about the non-compete. The non-compete binds total. It doesn't bind total as an entity. It binds Dorsey, right? And if Dorsey doesn't do this, are there other people at Total Liquor who can do the marketing to others? The company was Al Dorsey and his brother John. John died in March. That was the company. So for them to be restricted, they're not allowed under the non-compete to be indirectly involved with any company that is involved. I'm going to ask your friend on the other side whether there's any basis for distinguishing between the individuals and the company. As a practical matter, how could the company continue to do this under the non-compete? It can't. And that's what separates this case from Incident Air Freight in part. There's no non-compete in that case. Incident Air Freight is also distinguishable because that case did not involve the termination of a franchise. That case dealt with a. . . This wasn't technically a. . . Was there a formal franchise? There is a franchise relationship under New Jersey's law. We believe that's very clear. That was argued substantially to the district court. The district court didn't reach that issue. So there's no question in our minds, Your Honor, that it is a franchise and that they were improperly terminated under the Franchise Practices Act. You didn't preserve this argument that somehow there's a different standard because of New Jersey's franchise law. That wasn't argued or preserved earlier in this case. We did not argue in our briefs before the district court that irreparable harm need not be shown in order to get the statutory injunction. That's forfeited, then. We did argue, though, that we are entitled to the statutory injunction. And the district court, when it analyzed this case under Incident Air Freight, should have looked at the portion of the decision in which the court said, our decision very well may have differed if this was a case which involves public interest. But you didn't put that in your briefs. We did. We argued that no, we did not, Your Honor. We argued that we are entitled to the statutory injunction. Paragraph 102 of our complaint, we seek that relief. Part of our complaint incorporates and references four separate letters that our office sent. It's mentioned in the complaint, but if it wasn't in the briefing of the district court. It was part of the briefing. It was part of the standard. The standard is different because of the New Jersey statute. The standard as set forth in Incident Air Freight, where a statute specifies. When it was in your brief, did you make that specific argument to the district court? We did not make. We made the argument that we're entitled to the statutory injunction. All right. But you didn't put it this way. It's a different argument. We did not. In the motion for a stay, we embellished that argument by making reference to the various decisions which supported that position. We did make the argument before the district court that we are entitled to a statutory injunction. And the defendant was fully aware of that. We sent four separate letters, which are part of the record. Unless the court has further questions. No. We'll get you back on the bus. Do you pronounce it Burdette?  Yes, Your Honor. May it please the court, Bill Burdette on behalf of Berg Liquor Systems. I would point out that the other defendant in this matter was dissolved as a result of the asset purchase agreement and doesn't exist for purposes of any sort of representation. Berg Company? Berg Company, correct. So Berg Liquor is the one that survives? Is the one entity that survived the asset purchase agreement. After the assets were purchased from Berg Company, it was dissolved. Your Honor, this case, may it please the court, this case involves determining whether the lower court committed an abuse of discretion when it concluded that Total Liquor would not suffer reparable harm. The lower court never mentions the non-compete. That's correct, Your Honor. Okay. Your friend on the other side represents that Total is Albert now that his brother's dead. Yes. And Albert is bound by the non-compete. So how in the world is Total going to be able to go out and get new business if Albert presumably can't take part in managing Total in a way that breaches Albert's non-compete? Right. And that's a very good question, Your Honor, in that the non-compete in the asset purchase agreement does include the affiliates. So we would agree that Total Liquor should be bound by the non-compete provision. Should be bound by it. Is it an abuse of discretion for the court to have not mentioned or discussed this? I don't think it changes the result at all because in the, you know, prior to the asset purchase agreement, there was still an obligation to not sell items that compete with Berg Liquor directly. However, there was not an obligation, unlike in Atlantic City Coin or in the SEMS case where someone was only allowed to sell Ford motor cars, that you can't go to all of your bar customers where you're selling these tap dispensing so you can only pour a specific amount of beer every time, that you couldn't sell something else that's related to the bar industry. There's never been that restriction at all. For 45 years, and we have the last 25 years of data in the record, you know, sale of Berg Liquor products to the customers of Total Liquor averaged about $114,000 a year. You know, this is not a, you know, where there's, you know, how that employs, if that's the gross sales, four separate salespeople plus the Dorsey's, you know, is very surprising. And I would think that's part of what was going into it. We don't know for sure what Judge Shipp was saying in the lower court decision necessarily, but if we look at the record evidence and the numbers that were provided, it doesn't appear that this is that same sort of significant investment that someone might have in a, you know, it's, for example, in an automotive distributorship or like a dealership like in the SEMS case. Your friend on the other side says that the district court just overlooked or overlooked the declaration. Is that the best way to read the district court's opinion or do you read it some other way? I think that the district court looked at Mr. Dorsey's declaration as well as Mr. Barton's declaration. And certainly if in the supplemental appendix we have the order denying the requested stay, there's very clear analysis of Mr. Dorsey's declaration and the court says that this is the same evidence that was presented on the injunction. So I do believe that the court did analyze these things and may not have provided the level of specificity we would have liked, but I think that you can reach that conclusion. If you look at the Barton declaration, we see that Mr. Barton says, well, we went to the website of Total Liquor. They list 29 different products. Of those 29 products, 12 are discontinued bird products that are no longer available, leaving 17 available products. Of those 17 products, 10 are not bird products. More than half of the available products that Total Liquor lists on its website are not bird liquor products. So it's perfectly reasonable to say that this assertion, this is going to kill my business, this is going to cause 85% of my business to go away, is completely belied by their own website and Mr. Barton's declaration. Now, did he reference Mr. Barton's declaration in the order? No. But I don't know if he necessarily has to. If he says, I've considered this and I don't believe that it's necessary. He doesn't reference the non-compete. And the non-compete, at a minimum, is going to prevent them from, you know, selling a number of the products that they've been selling until then. They cannot sell. These are the devices that control the liquor poured out of a bottle or that come out of a tap. So you have consistent taps and consistent pours. It gives you cost control in that way. There is a wide variety of other products that could be sold to, and I think this was some of the contention in the interest instant air freight case, there's a lot of other things that someone could do. It does not necessarily mean that it has to be, you know, these bird liquor products. They have a long list of clients that presumably are bars. They know what the bar industry is. These taps, you know, these tap control mechanisms are put into the systems that chill the beer, that flow the beer through. There are any number of other products associated with those that could be sold. But who can they sell to? They can sell those to any bars they want, these other products. Well, there's a, the Dorsey Declaration says, look, this is the region we work in. Berg is a competitor in this region. And because of the non-compete, we're not allowed to sell to those people. They can't sell the very specific Berg, things that compete with Berg products, which is a very, very narrow space that control the pour of the liquor, that control the beer that comes out. The actual device that sends the beer out, the actual refrigerator that chills the beer, the actual tubes that run from the tap to the keg, the actual things that wash the glassware at the bar, all of those they could sell and would not be a violation of the non-compete. All of those they could have sold over the last 45 years. All of those they could have pursued as different product lines. They chose not to. Now that they're being terminated, because they did violate the non-compete and the asset purchase agreement, which certainly is not a pretext, that, you know, they, you know, they complain that they're going to lose all their business. They simply didn't pursue all their business. The Judiciary appeared to say that they had not violated the non-compete when they were terminated. Right. And that wasn't a fact that was discussed by the lower court, but we certainly maintain in the Barton Declaration sets out the very specific facts that indicate that this was competition, that they went to a bid that with a large casino conglomerate in order to sell with one of Berg Liquor's competitors. And those facts are not disputed. We may have to get into that in the lower court if this returns, but the fact of the matter is they have the opportunity to sell other things. There's nothing in this distributorship agreement that, by the way, my client had nothing to do with. You know, this was a distributorship agreement that was signed when Mr. Dorsey was a partner in the company. And this distributorship agreement, by the way, in paragraph two says, we're not a franchise. We're never going to think that we're a franchise. We should never be considered a franchise. And it's very interesting to me that now, after they get terminated and after they sell the business for competing, you know, with the purchaser of their business, that they now say, wait, we're a franchise and we need injunctive relief. We're going to suffer mightily because of this. But they don't have any really good evidence for that. And, you know, the cases that are cited on the other side are the Second Circuit case where Judge Friendly, being a very friendly guy, comes up with this concept out of whole cloth that a father and son have a right to continue selling Ford cars. He's relying on the statement from the Third Circuit. Correct. Since that time, the Third Circuit has issued a number of published decisions, including instant air freight, including the Texaco case, including the Liberty Lincoln Motor Auto Cars case, all of which say you have to take a hard look at irreparable harm to make sure that you have the, you know, that there is something here more than just monetary losses. And in this case, we have monetary losses. Judge Shipp recognized that there are these very specific numbers that we can ascertain. We have an average profits of the last 10 years of $54,000. This is just something that didn't even reach the top. You know, if this is going to destroy business, it doesn't reach the point where it says, hey, this is the same as a whole Ford dealership that can only sell Ford automobiles. Because that's what was at issue in the second serving case. So I want you to look at one sentence in the district court's opinion, the sentence where he says, a termination of a long sentence, in the absence of the dealership agreement, total liquor may pursue any and all potential customers. Is that a correct finding of fact, or is that an erroneous finding of fact? It cannot pursue. I would say that it cannot pursue customers selling liquor control devices. All right. So the non-compete clause survived the end of the termination of the dealership? Yes. It's in the asset purchase agreement, and I believe is a four or five-year non-compete provision. And that non-compete clause in the purchase agreement is not referenced in the district court's opinion? That is correct. Okay. So if one of the – I mean, that seems to be a key fact that was – a key fact that was proffered, you know, or averred to in the Dorsey Declaration, right, and in the record with the purchase agreement in the record. And if the district court did not account for that, how can we be sure that it did not abuse its discretion here? Well, I don't believe that it changes the outcome. In that, you know, one, they already had in the dealership agreement, you can't sell something that competes with a Berg company product. And so this was reaffirming that. And two, it doesn't change the outcome in that they can still sell anything else to any of their bar customers that they want that isn't a liquor control mechanism or a beer control mechanism, something that Berg Liquor sells. So, you know, we may not be able to go to the Berg competitor and say, I want to go sell your product for another – I guess we're probably up to about – you know, now we're almost three years into that arrangement. You know, they can go sell anything else. They can pursue any of the other items that they sell on their website, and they indicate that, you know, there's more than 50 percent of the products that are actually viable and still available for sale. You know, we didn't say that they couldn't keep doing that. So, you know, and I think that, you know, this is one of the other points that I want to make is that this, unlike the other cases that the franchise – under the Franchise Act or in other exclusive sales agreements like the Atlantic City Coin case, they didn't have an exclusive right in the territory that they had. That this isn't a dealership agreement that said you absolutely can. Before the asset purchase agreement was ever inked, Total Liquor had other distributors in New Jersey in their territory because of the fact that their sales were lagging. So this isn't something where they're given this grant, you know, for a full, complete territory in New Jersey to be the only person selling Berg products. They didn't meet their obligations, and they were given – you know, there were other distributors that were competing there. And I think that is an important one as well because there were acts that had predated the asset purchase agreement that was already declining their business. Now, this notion of irreparable harm, I think, is very interesting in that, and especially with these four letters that keep getting talked about, is that if this is the sort of thing that is immediate and irreparable that's required by every Third Circuit case, do you write four letters over a period of three months before you take any action? And say, can – you know, we need to – you know, we're going to sue you if you don't do this. Then we're going to sue you even more if you don't do this. They waited for a number of months, but, you know, from February until the end of June, right before the holiday weekend last year, in order to file this lawsuit and pursue a temporary restraining order and preliminary injunctive relief. Since that time, they didn't ask the district court to expedite anything. They said, great, we'll file the briefs and we'll wait for your opinion. August comes around. Then they file this appeal, and they ask for a stay. They don't ask for any expedited briefing. They didn't even file a reply on the stay. Once you get to this court, did they take advantage of a local appellate rule 4.1 asking to expedite proceedings in any sort of way? No. Did they say, hey, can we, under federal rule of appellate procedure, since we lost the stay argument in the district court, can we do this again? No, they didn't do that at all. There hasn't been any action by Total Liquor in the procedural history of this that would indicate they actually believe that this is irreparable harm, that this is over. And, you know, listening to Your Honor's comment about mootness before, the question would be, if this is immediate irreparable harm that occurred in April of 2023, and any time after this in 2024, in July or August, if this court were to direct the district court to issue a preliminary injunction, wouldn't that mean that the harm is reparable? Because at this point, that irreparable harm should have been incurred. And there really isn't anything else that anyone could do about that if it is actually irreparable. Are you asking us to sort of take in those facts, the procedural history of this case, into account as facts, rather than focus on what was before the district court at the time that it issued its opinion? Well, I think that it's important to consider in an analysis of irreparable injury whether or not this actually was immediate and irreparable. If it was, and we say, okay, district court, you have to go back and discuss this, what is the district court going to do if the irreparable injury has already happened? And if there is something that the district court could do, then to me that would mean that's reparable. Maybe they were able to hang on for a year but can't hang on for another year. Well, that would be interesting because then that would, to me, seem to indicate that it's not immediate and irreparable. It's required by the case law in this circuit. The word immediate precedes irreparable. And in many of these cases, I can recall the Golden Fortune case is the one that I, you know, that specifically says this is irreparable, needs to be irreparable and immediate harm. Thank you, Mr. Kennedy. Thank you. Sorry, Mr. Burdett. Now, Mr. Kennedy. Thank you, Judge. Your Honors, the business of Total Liquors for the past 45 years was selling and servicing liquor dispensing services. As a result of the wrongful termination and as a result of the non-competes, they can no longer engage in that business. That business is gone. That is irreparable harm. Further evidence of the irreparable harm, Your Honor, comes from the Supplemental Declaration. If it's gone, then what are you fighting about? Well, we're fighting, and I'm leading into that, Your Honor. We sought to stay from the district court because Total Liquor was trying to hang on. They were fighting to keep their business afloat. And Mr. Dorsey submitted a Supplemental Declaration at that point, at 8-273 in the record, in which he identified the actions post-termination that Berg was engaging in to thwart their efforts to try to stay alive. It refused to fill pre-termination contracts. It refused to allow Dorsey and Total Liquor to buy equipment. Is that properly before us, given the timing of when it was filed? It is because it goes to the issue of whether the business has been destroyed. We have the benefit of hindsight, to a certain extent. Normally, you're looking with foresight. Is it likely that the business is going to be destroyed? We now know, with the benefit of hindsight, that as of November of this past year, the actions taken by Berg prevented Total Liquors from having any chance of resurrecting the business or continuing the business. And, again, it wouldn't allow it to be a sub-dealer. It wouldn't allow it to buy equipment. It would not allow it to repair and service and warranty the work that it had already provided to its customers. And Mr. Dorsey indicated that we've lost our customers because what customer wants to use a dealer that can't provide you with equipment and can't service the equipment that we previously provided? Do you agree that Total Liquor has products that it can sell that don't compete with Berg products and it can continue to market those to customers? Its business has been in the liquor dispensing industry. That's what Berg does. And 85% of the business that it has generated throughout this 45 years is from that. 15%. I'm not exactly sure what that was. But they don't have the ability to conduct the business that it has run for 45 years. It's that business that has been lost. It's that loss of that business that constitutes irreparable harm. Does it have to be the same exact business that existed ahead of time? If you have the capability of moving on to a different customer or moving on to a different product, is that a factor that should be considered in assessing irreparable harm? In Atlantic City Coin, that issue was examined. And there the court said, apropos to this case, Mr. Dorsey for 45 years has been hyping and selling exclusively the Berg liquor products and this is the best product around. How can he now go into another dealership and then approach his customers and say, Oh, you know what? For the past 45 years, I've been selling you a bill of goods. I now have this new product. Why don't you buy this new product from me? In Atlantic City Coin, the court recognized that that But we know he couldn't be selling a competing product anyway because of a non-competer. It would have to be something that's of a different type. Right. It would have to morph into a different, right? So, I mean, there's nothing prohibiting him from altering the business model. He could start selling cars if he had the ability to sell cars, but that's not the business that he was in for 45 years. This is a very unique case in that you have the non-compete and the coupling with the wrongful termination. Not only does it prevent the business from continuing to operate, it prevents this man from earning a livelihood. All right. We thank both sides for their helpful briefing and argument. We'll take the matter under advisement.